E. E. R. Shapiro and Rubye Shapiro v. Commissioner.
Shapiro v. Commissioner
Docket Nos. 59865, 59866, 59867.
United States Tax Court
T.C. Memo 1959-151; 1959 Tax Ct. Memo LEXIS 96; 18 T.C.M. (CCH) 648; T.C.M. (RIA) 59151; July 24, 1959
*96 Conrad T. Hubner, Esq., and Ralph A. Taylor, Esq., 68 Post Street, San Francisco, Calif., for the petitioners. C. W. Nyquist, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies and additions to tax under section 293(b) of the Internal Revenue Code of 1939 as follows: Additions
to tax
Docket
under section
Number
Year
Deficiency
293(b)
59865
1945
$13,500.41
$ 6,750.21
1946
11,631.00
5,815.50
1947
31,682.27
15,841.14
59866
1945
13,500.41
None
1946
11,631.00
None
1947
31,682.27
None
59867
1948
91,109.34
45,554.67
The questions are whether the petitioner, an automobile dealer, realized income in the year of the crediting when he sold automobiles under conditional sales contracts which he in turn sold to a finance company, which, in addition to paying the dealer cash, credited an amount to a "dealer's reserve account"; and whether if such income was realized there should also be included in the petitioner's income cash withdrawn in the taxable year from the dealer's reserve, which cash was attributable to amounts credited to that *97 reserve in prior years without having been included in the petitioner's income in those prior years. The parties have stipulated that the additions to tax are proper for any deficiencies determined in these proceedings. Findings of Fact The stipulated facts are found. The petitioners E. E. R. Shapiro and Rubye Shapiro throughout the years in controversy were husband and wife and residents of the State of California. All of their income was community income. The petitioners for the calendar years 1945, 1946, and 1947, filed separate Federal income tax returns and for the year 1948 they filed a joint return with the collector of internal revenue at San Francisco, California. E. E. R. Shapiro, hereinafter referred to as petitioner, during the taxable years was engaged in the business of buying and selling used automobiles and trucks at San Francisco. A substantial portion of the petitioner's sales of automobiles and trucks were made upon written agreements commonly referred to as "conditional sale contracts," by the terms of which, title is retained by the seller until the entire purchase price, finance, and other charges, are paid in full. The petitioner sold most of *98 these contracts of conditional sale to Pacific Finance Co. and usually executed an "Assignment and Repurchase Agreement" on a form printed on the reverse of the contract of conditional sale. These are the only contracts in issue. The pertinent provisions of the assignment and repurchase agreement executed by the petitioner at the time of the sale of the contracts to Pacific are as follows: The assignment was of the "contract, title to and property in said contract mentioned", with warranty of title. An agreement was made by the petitioner in the event of repossession by assignee for reasons and within the time specified to pay the "balance remaining under said contract." A waiver was made by the petitioner of the right to have the vehicle returned to him under specified conditions in which event the assignee could sell the vehicle pursuant to the contract of conditional sale and the petitioner assumed the obligation of the purchaser under such circumstances as provided in the contract of conditional sale. Assignee could extend time of payment and change the terms of the contract without releasing the petitioner from liability. The petitioner filed financial statements and *99 applications for credit with Pacific during the period involved which provided that Pacific, in the event of default of any of the petitioner's obligations to it could declare all direct obligations immediately due and payable, offset all obligations due the petitioner against his obligations to them, or against his property then or subsequently in their possession. The petitioner also authorized Pacific to retain in its possession and control until all of his obligations to Pacific were fully paid and discharged, any amounts becoming due to the petitioner or property of his coming into Pacific's possession or control. A request was made in the application for Pacific to purchase contracts and extend credit on trust receipts and extend credit generally in consideration whereof the petitioner guaranteed the "full payment of all sums now and which may hereafter become due from applicant." The petitioner, during the period involved. was continuously indebted to Pacific on loans secured by pledges of a large portion of his inventory of automobiles. The trust receipt agreements signed by the petitioner provide that in the event of default by the petitioner of any provision of the trust *100 receipt agreement or any other agreement between the petitioner and Pacific, all amounts secured may immediately be declared due and in the event of sale pursuant to the trust receipt, excess proceeds over expenses of sale and the obligations secured by the trust receipt may be applied to any obligation of the petitioner to Pacific, and the balance paid to the petitioner. The branch manager of Pacific at San Francisco addressed the petitioner a letter on May 27, 1948, which stated.. "Pacific Finance Co. will purchase conditional sale contracts without withhold from the purchase price where the unpaid balance does not exceed the full wholesale value of the car upon the understanding (1) they will not be called on to make any releases against the dealer's reserve account (2) the reserve account will be maintained at not less than 10% of the outstanding contingent liability (3) the unpaid portion of any over-advance and any unearned dealer reserve in the contract will be refunded by Shapiro where the unpaid balance is charged off because of confiscation or conversion." The petitioner's reserve balance was the indicated per cent of his total liability to Pacific at the year ended: *101 Taxpayer's
Liability
Outstanding
to Finance
Balance
Company for
of Contracts
Ratio
Funds Borrowed
Assigned
of Total
to Finance
to Finance
Reserve
Liability to
Year Ended
Cars Floored
Company
Total
Balance
Reserve
12/31/45
$ 46,176.00
$ 166,487.00
$ 212,663
$ 43,384.86
.204
12/31/46
54,397.00
151,264.00
205,661
47,182.00
.228
1/31/47
52,094.00
155,443.00
207,537
48,864.00
.235
2/28/47
56,201.00
163,781.00
219,982
33,545.00
.152
3/31/47
73,946.00
204,596.00
278,542
37,932.00
.136
4/30/47
90,845.00
223,819.00
314,664
42,559.00
.135
5/31/47
122,565.00
266,991.00
389,556
47,836.00
.122
6/30/47
103,658.00
335,220.00
438,878
53,101.00
.120
7/31/47
102,837.00
373,204.00
476,041
63,311.00
.132
8/31/47
106,841.00
428,426.00
535,267
66,680.00
.124
9/30/47
133,245.00
494,289.00
627,534
73,951.00
.117
10/30/47
109,479.00
563,545.00
673,024
82,726.00
.122
11/30/47
100,580.00
679,125.00
779,705
91,104.00
.116
12/31/47
149,013.00
841,512.00
990,525
103,731.00
.105
1/31/48
153,627.00
962,023.00
1,115,650
116,150.00
.104
2/29/48
190,873.00
1,195,739.00
1,386,612
156,414.00
.112
3/31/48
171,346.00
1,418,414.00
1,589,760
152,780.00
.096
4/30/48
163,122.00
1,530,108.00
1,693,230
165,928.00
.097
5/31/48
200,632.00
1,707,588.00
1,908,220
178,674.00
.093
6/30/48
150,303.00
1,750,836.00
1,901,139
188,766.00
.099
7/31/48
155,599.00
1,780,366.00
1,935,965
197,075.00
.101
8/31/48
142,284.00
1,847,134.00
1,989,418
206,465.00
.103
9/30/48
63,337.00
1,925,349.00
1,988,686
225,880.00
.113
10/31/48
109,768.00
2,009,668.00
2,119,436
229,005.00
.108
11/30/48
113,312.00
1,943,067.00
2,056,379
232,423.00
.113
12/31/48
129,800.00
1,900,390.00
2,030,190
237,410.00
.116
*102 There were no written agreements relating to finance reserves between the petitioner and Pacific other than the agreements referred to above. In "Dealer Plan Sheets" furnished to Pacific by its San Francisco office with reference to its plan of doing business with the petitioner, the following was stated under the heading "Payment of Reserves": "(a) Plan sheet dated December 13, 1944: 'Monthly in excess of 5% of Contingent & Wholesale Liability.' "(b) Plan sheet dated October 11, 1946: 'Monthly in excess of 5% of Contingent & Wholesale Liability.' "(c) Plan sheet dated March 25, 1948: 'Excess of 5% of Cont. Liability upon manager's approval.' "(d) Plan sheet dated May 28, 1948: 'Excess over 10% of Cont. Liability upon manager's approval only.'" As used herein, the following terms have the following meaning: "'Direct liability' or 'wholesale liability' means the dealer's obligation secured by pledges of his inventory on trust receipts. "'Contingent liability' means the total liability of the dealer for the balances due on all outstanding and unpaid contracts sold the finance company. "'Unpaid balance' means the total unapid balance due from the purchaser of a vehicle *103 excluding the time price differential. "'Time price differential' means the addition to the cash price by reason of payment being made over a period of time." The amount of the time price differential which the petitioner charged was not determined by Pacific, but was determined by the petitioner. Any amount by which the time price differential exceeded the amount charged by Pacific on a particular deal would be credited to the petitioner's dealer's reserve account. The dealer knows he can depend upon a larger credit to his reserve if he charges a larger time price differential. When Pacific purchased a contract of conditional sale from the petitioner they would pay the "unpaid blance" to the petitioner. The time price differential provided for in the contract would be recorded and allocated on the books of Pacific as follows: "$7.50 was credited as a flat charge for setting up and handling costs. A portion was credited to unearned finance income. The balance was credited to dealer's reserve." Pacific would pay the petitioner by a voucher form check on which would show the amount credited to dealer's reserve and each month the petitioner was furnished a statement of the *104 account showing debits and credits during the month and the balance. The petitioner did not record on his books any credits or charge made to the dealer's reserve account on the books of Pacific, or any of the information shown on Pacific's voucher check. The sale was recorded on the petitioner's books as of the date he received Pacific's check and as being made for a total price which excluded time price differential. If the contract was not assigned to Pacific the sale was recorded as being made for a price which included the time price differential. As a matter of company policy, Pacific did not charge the full time price differential if customers prepaid their contracts. In such cases, the unearned and uncollected portions of the time price differential originally credited to the dealer's reserve account was charged back against the account. In the case of the petitioner, when cars were repossessed, Pacific did not require full payment of the total unpaid balance due on the contract, but excluded the unearned and uncollected balance due on time price differential and charged the dealer's reserve account for the portion thereof originally credited in connection with the contract, *105 less that portion already collected. Other charges to the reserve account were to correct errors and mistakes, insurance adjustments, and for payments made to the dealer. The charges to the reserve account amounted to $2,364.30 in 1947 and $14,163.39 in 1948. In addition, a 1947 charge of $17,500 was for money paid to the petitioner. The dealer reserve was setup by Pacific primarily to protect itself. Pacific attempted to keep the reserve as high as possible at all times. The branch manager at San Francisco where the petitioner did business, was more conservative than standard company policy. He was the person who handled the payments that would be made to a dealer and charged to the reserve. Payments to dealers were made on the basis of review of his account at which time Pacific would consider his direct liability and any delinquencies, his repossessions, business conditions generally, types of contracts being handled, his family conditions, and his moral character. The ratio of his reserve balance to his contingent liability was not particularly considered, the age of the contracts was considered a more important factor. Pacific was particularly concerned with the dealer's *106 personal situation, and their own experience with him. Every month during 1947 and 1948 when the petitioner received from Pacific the statement of the reserve account, he requested money from Pacific to be charged against the account. During these years only one payment was made to him, namely, the $17,500 paid on February 28, 1947. All other requests were refused. The books of Pacific show the following from the petitioner's dealer's finance reserve account: Payments
Balance
(A)
Made to
Net Increase
Beginning
Additions
to Taxpayer
(Decrease)
Balance
Year Ended
of Year
During Year
During Year
During Year
End of Year
12/31/39
$ 0.00
$ 471.83
$ 471.83
$ 471.83
12/31/40
471.83
1,915.39
1,915.30
2,387.22
12/31/41
2,387.22
12,328.51
$ 4,593.95
7,734.56
10,121.78
12/31/42
10,121.78
29,171.38
11,838.41
17,332.97
27,454.75
12/31/43
27,454.75
23,816.68
18,524.95
5,291.63
32,746.38
12/31/44
32,746.38
30,083.71
12,000.00
18,083.71
50,830.09
12/31/45
50,830.09
24,554.77
32,000.00
(7,445.23)
43,384.86
12/31/46
43,384.86
19,797.38
16,000.00
3,797.38
47,182.24
12/31/47
47,182.24
74,048.98
17,500.00
56,548.98
103,731.22
12/31/48
103,731.22
133,678.78
133,678.78
237,410.00
*107 The petitioner received payment from Pacific of sums of money that were charged to his reserve account on the books of Pacific Finance Co. in the following amounts in the years indicated: 1950
$ 25,000
1951
78,000
1952
70,000
1953
147,877
1954
147,000
1955
150,000
During the years involved, included in the income, the petitioners reported, were the following sums received from Pacific and charged to the reserve account of the petitioner: 1945
$16,000
1946
16,000
1947
17,500
If and when all contracts purchased by Pacific from the petitioner were paid in full, and if there were no other obligations of the petitioner to Pacific, the petitioner would be entitled to any balance in the reserve account. The dealer's reserve account maintained on the books of Pacific was listed *108 as a corporate liability on that company's financial statement. The accumulated balance in the reserve account of the petitioner on the Pacific books at December 31, 1944, was $50,830.09. The Commissioner determined this sum was taxable as received and has included it as taxable income of petitioners as follows: 1945
$32,000.00
1946
16,000.00
1947
2,830.09
The Commissioner also, in computing the petitioners' income, included an amount equal to the credits on the books of Pacific to the reserve account of the petitioner for each year, less charges to the reserve (excepting for payments to the petitioner), as follows: 1945
$ 24,554.77
1946
19,797.38
1947
74,048.98
1948
133,678.78
The sums so added to income by the Commissioner on an accrual basis were paid to the petitioner in 1950 and subsequent years, and were reported in the tax returns of petitioners as income in the years of receipt. The petitioner's books of account maintained a record of his inventory of automobiles and the petitioner recorded sales made of the automobiles on credit. The petitioner's books were kept and his income reported on an accrual basis. Pacific did not *109 accept all contracts tendered to it. The petitioner did not have an inventory of contracts of conditional sale held by him for sale. The policies and terms of Pacific might change with changes in the general economic conditions. The petitioner, during the later years involved, was selling new or relatively new automobiles. These cars were sold at prices far in excess of the new car price when originally sold by the new car dealers with large unpaid balances. The petitioner's contingent liability to Pacific increased rapidly. When dealers with Pacific repurchase cars from finance companies, they pay the unpaid balance of the retail selling price. If the dealer does not pay, the finance company has to sell the car at wholesale or less and during the period involved would have sustained substantial losses. In 1947, repossessed cars were sold by Shapiro for a total amount of $41,858.45; in 1948, repossessed cars were sold by him for $183,846.28. In the event the petitioner did not repurchase the car in default, Pacific sold the car at a wholesale and not a retail price. Opinion
LEMIRE, Judge: The petitioner was a retail used car dealer who maintained inventories. He was on an *110 accrual basis of accounting and reporting income. Charles M. Kilborn, 29 T.C. 102. The petitioner sold automobiles on credit. Conditional sales contracts covering these dealings showed the cash selling price; from this was deducted the "down payment" to arrive at the "amount unpaid on cash price"; to this was added the cost of insurance premiums, registration and title fees to reach the "unpaid balance", to this there was added a "time price differential." This was any figure to which the petitioner could get the customer to agree. The sum of the last two items was the "total contract balance due from seller." These contracts were sold to Pacific Finance Company. When Pacific bought these contracts it would pay the petitioner the "unpaid blance" in cash. The difference between the amount of cash and the "total contract balance due from seller" was the so-called "time price differential." This was allocated to a $7.50 credit to Pacific as a charge for handling; a credit of a percentage rate of interest on the "unpaid balance" (discount) to Pacific as unearned income; and the remainder as a credit to the petitioner's "dealer reserve account" on Pacific's books. This *111 reserve supported the petitioner's guaranty of the contract payments and other liabilities which it had to Pacific. It was thus, on crediting, used for the petitioner's benefit in accordance with the petitioner's own agreement. The dealer reserve was paid to the petitioner, in part, when, in the judgment of Pacific, it was larger than necessary to meet the requirements of the guaranty. The petitioner eventually was entitled to any balance in the reserve, subject to liabilities to Pacific. The amounts credited to the petitioner's "dealer reserve account" are accruable and taxable to him in the year in which they were credited. They are part of the full price for which the petitioner sold the automobiles. The Supreme Court recently affirmed the Tax Court's view that comparable dealer reserve arrangements gave the dealers a fixed right to receive, albeit in a later year, the amounts credited to their reserve accounts; that these credits belonged to the dealers subject only to their pledge as collateral security in accordance with the agreements between the dealer and the finance company; and that they were accruable and taxable to the dealers in the year of crediting. Commissioner v. Hansen, 360 U.S. 446 (1959), *112 reversing 258 Fed. (2d) 585, reversing on this issue a Memorandum Opinion of this Court [16 TCM 471; T.C. Memo. 1957-113]; Commissioner v. Glover, 360 U.S. 446 (1959), reversing 253 Fed. (2d) 735, reversing a Memorandum Opinion of this Court [16 TCM 203; T.C. Memo. 1957-45]; and Baird v. Commissioner, 360 U.S. 446 (1959), affirming 256 Fed. (2d) 918, affirming a Memorandum Opinion of this Court [16 TCM 867; T.C. Memo. 1957-192]. The petitioner argues that there is no "withhold" by Pacific in issue in the present case. He is right in the sense that Pacific held back in its payment for the conditional sales contracts no amount from what would have been the price if the car was sold for cash. Here the "dealer's reserve" in question was derived from the "time price differential," but it is not clear that it was not in reality the same thing and not a participation in the interest, as such, to be collected. The Supreme Court did not find the facts sufficient in the cases before them to pass upon the issue of whether the arrangements there *113 were a reserve related to interest due in the future. However, this Court, since its earliest "dealer reserve" case of Shoemaker-Nash Inc., 41 B.T.A. 417, has held that dealer reserves which were formed from a part of the carrying or finance charge, as distinguished [from] the cash price paid for the contract, were accruable as income when credited to the dealer reserves. To the same effect, see also, Albert M. Brodsky, 27 T.C. 216; Arthur V. Morgan, 29 T.C. 63; and Wiley v. Commissioner, 266 Fed. (2d) 48, affirming a Memorandum Opinion of this Court [16 TCM 1089; T.C. Memo. 1957-236]. Arthur V. Morgan, supra, like the petitioner here, was a car dealer in California. The transactions were strikingly similar situations. We said: "We do not agree with the petitioners that the arrangement between the partnership and the bank was in the nature of a joint venture in which each was to share in the time-price differential as it was 'earned.' Actually the bank was making a specific charge and its income from the transaction was limited to that amount. As we view the relationship between the partnership *114 and the bank, the bank undertook an obligation to satisfy the full amount of the contract balance, less its discount consisting of its specific charge and a percentage of the total contract balance. * * *" See also Edward C. Cadjew, 18 TCM 641 decided this day. This issue is decided for the Commissioner. The Commissioner has also included in the petitioner's income for 1945, 1946, and 1947, cash payments which he received in those years on account of the accumulated balance in the petitioner's dealer's reserve account on the books of Pacific on December 31, 1944. The Commissioner's theory is that an accrual basis is the only proper method for determining the petitioner's income from the automobile business, that the credits representing these cash payments in the years in question were not accrued and taken into income in the prior years, and therefore, should be included in 1945, 1946, and 1947, when they were received in cash. The Commissioner at the hearing expressed the belief that his position was contrary to the holdings of this Court on similar situations. He was right. See, e.g., Estate of Samuel Mnookin, 12 T.C. 744, affd. 184 Fed. (2d) 89; *115 Commissioner v. Dwyer, 203 Fed. (2d) 522, affirming a Memorandum Opinion of this Court [10 TCM 620]. Decisions will be entered under Rule 50. Footnotes
A. Represents gross additions during the year less charges made for refunds to customers for unearned time price differential charges due to prepayments of installment contracts and charges made for portion of reserve applicable to unearned time differential charge at date of repossession of used cars, corrections and other adjustments made by Pacific.↩